UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re                                                   Chapter 11

FV Steel and Wire Company, et al.,                      Case No. 04-22421-svk

      Reorganized Debtors.

MEMORANDUM DECISION ON ALLOWANCE OF CLAIM

### Background and Facts

In 1989, the United States Environmental Protection Agency ("EPA") named various parties, including the Glidden Company and DeSoto, Inc., now known as Sherman Wire Company (the "Debtor"), as potentially responsible parties ("PRPs") liable for the cleanup of the Chemical Recycling, Inc. hazardous waste site located in Wylie, Texas (the "site" or the "CRI Site"). Without admitting liability, the PRPs entered into the Chemical Recycling, Inc. Site Agreement for Participation (the "Agreement") to jointly manage the cleanup. The Agreement created the CRI Steering Committee (the "CRI Committee") to organize the initiative and apportion the liability among the parties. The EPA issued an Administrative Consent Order on August 4, 1989,[1] and the PRPs contributed funds to the cleanup.[2] Various drums and tanks were removed in the 1989 to 1990 timeframe, and the site was fenced, but very little else occurred at the site until 2004, when a new EPA On Scene Coordinator was appointed. The EPA issued Action Memoranda which purported to modify the Statement of Work in 2005 and 2006, but no work has been done at the site (except for testing and monitoring) since 1990.

---

[1] This 1989 Consent Order set forth two phases of cleanup. The first phase was an above the surface cleanup to remove the actual hard tanks and drums. The second phase consisted of an investigation of the soil and groundwater.
[2] The Debtor has actually overpaid $53,100 according to the CRI Committee.

The Debtor filed a chapter 11 petition on February 26, 2004. The claims bar date for nongovernmental entities was July 1, 2004, and the claims bar date for governmental units was August 24, 2004. The CRI Committee and Glidden filed timely proofs of claim related to the site, but, although it had filed claims related to the cleanup of other sites in which the Debtor was involved, the EPA did not file a proof of claim related to the CRI Site. After the claims bar date expired, the Debtor withdrew from the Agreement. The CRI Committee and Glidden[3] then sought leave to file a late proof of claim on behalf of the EPA, claiming that excusable neglect operated to excuse its failure to file this claim prior to the bar date. Although this Court ruled that the doctrine of excusable neglect as dictated by the 7th Circuit Court of Appeals did not permit the late filing of the claim, this decision was reversed on appeal by the District Court. On remand, this Court disallowed the claims filed by Glidden and the CRI Committee based on Bankruptcy Code § 502(e)(1)(B), which bars contingent claims for contribution and reimbursement.[4] However, the court permitted the CRI Committee to file the claim on behalf of the EPA[5] and proceeded with an estimation hearing under 11 U.S.C. § 502(c)(1). The parties have filed post trial briefs.

### Arguments and Evidence Adduced at Estimation Hearing

The CRI Committee's position is that the Debtor is one of the PRPs responsible for addressing the hazardous condition of the site. Citing the Comprehensive Environmental

---

[3] For convenience, these parties will be referred to jointly as the "CRI Committee," although technically, Glidden is one member of the Committee, and they initially filed separate claims. They have filed one claim on behalf of the EPA, which is the subject of this dispute.

[4] It is undisputed that Glidden and the CRI Committee's claims against the Debtor remain completely contingent, as they have not spent any funds that have not been reimbursed by the Debtor. In fact, they admit that the Debtor has overpaid for its contribution to the 1989 cleanup.

[5] The CRI Committee filed the claim on behalf of the EPA under 11 U.S.C. § 501(b) which states in pertinent part: "If a creditor does not timely file a proof of such creditor's claim, an entity that is liable to such creditor with the debtor, or that has secured such creditor, may file a proof of such claim."

Response, Compensation, and Liability Act ("CERCLA"),[6] the CRI Committee contends that the EPA is authorized and empowered to enforce the Consent Order against the Debtor, and alleges that the Debtor, among the other PRPs, was ordered by the EPA to conduct a removal action to address the conditions at the site, that the cleanup is not complete, and that the Debtor is jointly and severally liable for the $1.7 – $1.9 million estimated cost to finish the cleanup.

The Debtor contends that the cleanup is virtually complete, and points out that no activity has taken place at the site for many years. The Debtor argues that even in the unlikely event that further cleanup would be required by the EPA, all that should be necessary is monitoring and/or capping the area where the concentration of contaminated soils is found. Moreover, the Debtor contends that the EPA's claim should be limited to costs spent by the EPA itself, not by those costs that the EPA will visit upon the CRI Committee.

At the estimation hearing, the CRI Committee presented the expert testimony of Jay Winters, an employee of the environmental consulting firm Golder Associates, Inc.[7] who has been involved with the site since November 1989, and wrote a 2006 Site Investigation Report published in January 2007. Winters testified that even though the CRI Site is located in an industrial area and there is no threat to human life, the EPA will require the PRPs to remove about 1640 cubic yards – about 80 truck loads -- of contaminated soil.[8] The trucks loaded with contaminated soil would be sent to a chemical waste management facility in Louisiana at a cost of about $1.5 million. While acknowledging that there is no evidence of any expanding plume of

---

[6] 42 U.S.C. §§ 9601-9628.
[7] Golder is the environmental consulting firm that conducted the previous investigations and analyses of the CRI Site beginning in 1990. The report published in January 2007 is the most recent report.
[8] According to Winters, this figure is partially based on historical data and partially extrapolated from a bid obtained in December 2006 from USA Environmental. Winters obtained the bid for removal and transport of 900 cubic yards of contaminated soil contained in "experimental roads," and then added the costs to remove and transport an additional 740 cubic yards of soil that he identified from a 1992 report. However an exhibit to the EPA's March 2006 Modified Statement of Work indicates that only 601 cubic yards of contaminated soil needs to be removed, and the Debtor's expert opined that only one-third of the amount of soil identified by Golder exceeds acceptable levels for an industrial site.

3

contaminated groundwater, he stated the groundwater at the site would require monitoring over 10 years.[9] However, he admitted that the primary waste at the CRI Site is lead and chlorinated solvents in stillbottoms[10] that pose a limited threat to the groundwater.

The CRI Committee acknowledges that "only the EPA has authority to determine that all obligations under the Consent Order have been satisfied." However, the CRI Committee did not produce a single witness from the EPA to state what further action will be required for the CRI Site or whether EPA will require the soil to be removed or the groundwater monitored. Glidden's director of environmental claims and remediation testified that to date, the EPA has not required any soils to be removed, although various reports showing the lead contamination as "fairly high," have been provided to the EPA since 1990.[11] Further, even in his role as an environmental consultant for the CRI Committee, Winters admitted that he never had any direct correspondence with the EPA nor any communications concerning whether the Modified Statement of Work would be approved or soil removal required. Currently, there is no EPA order in existence requiring soil removal, and the CRI Committee was at a loss to explain why the EPA has not taken action in the last 17 years. Even assuming that the cleanup of this site fell through some bureaucratic cracks until the appointment of the new On Scene Coordinator in 2004, there is no explanation as to why, if this site is in imminent need of cleanup, the EPA did not file its own proof of claim in Debtor's case at that time, or seek an extension of the August 24, 2006 bar date to file a claim, especially when the EPA had filed other claims in this case for other contaminated sites.

---

[9] To Winter's knowledge, however, the EPA never ordered groundwater monitoring.
[10] Stillbottoms are defined as a concentration of the non-solvent components that settle to the bottom of distillation units in the recycling process.
[11] Robert Kovalak also testified at his March 20, 2007 deposition and at the trial that in his opinion, the contaminated soil at the site needed to be "addressed," but not necessarily removed. He posited that a "RCRA cap" would be an option; apparently such caps are used to seal and protect landfills, and are more expensive than the asphalt cap proposed by the Debtor.

4

The Debtor argued that the 1989 Consent Order was not "open-ended" but rather contained a specific, limited scope of activities that the Debtor and the other PRPs completed more than 17 years ago when the drum and tank removal action at the site was undertaken.[12] The Debtor presented the testimony of Michael Hawthorne, an environmental consultant and remediation expert who designed software used by the Texas Commission of Environmental Quality (TCEQ). Hawthorne reviewed the Golder report and opined that removal of the soil is the least preferred method of addressing any remaining issues at the CRI Site, because digging up and hauling away the soil increases the risk of exposing people to the hazardous materials. The Debtor contends soil removal is inconsistent with the National Contingency Plan because the site in its current state does not pose an imminent threat to human health or the environment. Hawthorne described the CRI Site as a commercial fenced area, bordered by railroad tracks and a highway, and the site is green with vegetation and grown trees. Although a 2004 inspection indicated a problem with the fence at the site,[13] Hawthorne's 2007 inspection and Golder's latest report confirms that the fence is stable and secure and in "good condition."

Based upon his reading of the 2007 expert report, Hawthorne stated that Golder Associates applied the most conservative protective concentration levels to the site which inflated the cleanup estimation.[14] Consequently, the CRI Committee's claim is based upon a significant overestimation of the amount of soil that should be cleaned up. According to his reading of the 2007 report, Hawthorne stated that only one sample had a lead concentration of

---

[12] The Debtor points out that since 1989 the EPA has not made any demands or provided any notice to Sherman Wire asking it to take action under the Consent Order. The Debtor states that pursuant to Section VIIA of the Consent Order, modifications or amendments to the Scope of Work under the Consent Order require the agreement of all of the parties, and the Debtor has never consented.

[13] March 1, 2005 Action Memorandum, attached as Exhibit 14 to the proof of claim.

[14] Hawthorne stated that protective levels depend on the classification of the site (commercial or residential) and whether a Tier 1 (grossly conservative), Tier 2 (middle), or Tier 3 (rare) standard applies. According to Hawthorne, the CRI Site is unquestionably commercial and natural attenuation has significantly ameliorated the contamination, yet he implied that Golder applied a Tier 1 standard, such that the removal of the 1640 cubic yards of soil was "overkill".

5

10,300.[15]  Hawthorne opined that one acceptable remedy would be leaving the soil in place, and taking no action but keeping the site fenced and protected.  He stated that natural attenuation has significantly reduced the problems at the site, and given the state of the site and the nature of the soil, would continue to do so.  If more than "no action" is required, Hawthorne testified that based on the hundreds of cleanups similar to the CRI Site with which he is familiar, rather than removing and transporting the soil, the usual approach is to eliminate the risk of exposure by capping the area of contaminated soil.[16]  According to Hawthorne, an asphalt cap would serve as an acceptable material costing anywhere from $19,000 to $60,000.  Hawthorne based his recommendation on the following two undisputed assertions:  first, there is mostly clay at the CRI Site and very little groundwater,[17] and second, significant natural attenuation has reduced the levels of concentration at the CRI Site.

## Objections to the Expert Testimony by the CRI Committee

The CRI Committee objected to almost all of Hawthorne's testimony due to the alleged failure of his expert report to comply with the requirements of Fed. R. Civ. P. 26(a).  The report is only a few pages long, and the CRI Committee alleges that it violates Rule 26(a)(2) because the report does not contain all the opinions Hawthorne expressed, and the basis and reasons for his opinions, and failed to list all of the data and other information considered by Hawthorne in forming his opinion.  In considering this objection, the court is mindful of the context in which

---

[15] The following is the Debtor's interpretation of Golder's 2007 report:  only 16% of the samples at the 0-6 inch level had concentrations above mandatory cleanup levels, only 8% of the samples at the 6-12 inch level had concentration above mandatory cleanup levels, and 0% of the samples at the 12-18 inch levels had concentration above mandatory cleanup levels. One sample was at 10,300, one sample was at 5,800, and the majority of the samples collected were under the 1000 range.  When the correct protective concentration levels are used, Hawthorne stated that only a third of the soil identified by Golder would need to be dealt with.  Hawthorne testified that Golder used an incorrect decimal point for at least one part of its analysis, inflating the concentration levels and cost of the cleanup.

[16] Hawthorne compared the CRI Site to the Aztec Ceramics site where an asphalt cover was acceptable to Texas regulatory authorities.

[17] Under the Texas Rules, to be considered groundwater a site must have a conductivity of 10 to the negative 5 power, and the CRI Site is at 10 to the negative 7 power.

this dispute arises: a disputed claim estimation proceeding. The Bankruptcy Code is silent as to the exact procedures governing a claim estimation hearing,[18] but the Federal Rules of Bankruptcy Procedure suggest that this dispute is a "contested matter" rather than an "adversary proceeding." As such, it is questionable whether the provisions of Rule 26 allegedly violated by the Debtor's expert even apply. This claim objection proceeding is not an adversary proceeding, since it has not been joined with a demand for any of the relief described in Rule 7001. See Fed. R. Bankr. P. 3007; *In re Calisoff*, 94 B.R. 1002, 1004 (Bankr. N.D. Ill. 1988) ("An objection to a claim does not give rise to an adversary proceeding (unless the objection seeks relief other than disallowance of the claim), but to a contested matter. See, Bankr. R. 3007 and 9014, and Advisory Committee Notes to both rules.")

Bankruptcy Rule 9014 supplies the procedures in contested matters that are not otherwise governed by the Bankruptcy Rules. In contested matters, unless the court orders otherwise, Fed. R. Civ. P. 26(a)(2) (disclosures regarding expert testimony) "shall not apply." Fed. R. Bankr. P. 9014(c). Since no court order exists directing that Rule 26(a)(2) shall apply to this contested matter, the alleged failure of the Debtor's expert to comply with the disclosure requirements of the Rule is of no consequence.

Moreover, courts are given a great deal of judicial discretion in designing the procedures for a claim estimation proceeding, such that a judge can elect to use "whatever method [19] is best suited to the circumstances." *In re Thomson McKinnon Sec., Inc.*, 191 B.R. 976, 979 (Bankr. S.D.N.Y. 1996), citing *Addison v. Langston* (*In re Brints Cotton Mktg. Inc.*), 737 F.2d 1338,

---

[18] 11 U.S.C. § 502(c)(1) states "There shall be estimated for purpose of allowance under this section—any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case."

[19] "The methods used by courts have run the gamut from summary trials, to full-blown evidentiary hearings, to a mere review of pleadings, briefs, and a one-day hearing involving oral argument of counsel." *In re Windsor Plumbing Supply Co. Inc.*, 170 B.R. 503, 520 (Bankr. E.D.N.Y. 1994). (internal citations omitted).

7

1341 (5th Cir. 1984). Consistent with the goal of prompt and efficient resolution of bankruptcy cases, "[e]stimation is merely a quick way for a bankruptcy court to liquidate a disputed claim when a full fledged trial would delay administration of the case." *In re Dow Corning*, 211 B.R. 545, 560 (Bankr. E.D. Mich. 1997).

The case law suggests that formal claim estimation proceedings are not the norm, and in fact, "it may be sometimes inappropriate to hold time-consuming proceedings which would defeat the very purpose of 11 U.S.C. §502(c)(1) to avoid undue delay." *In re Windsor Plumbing Supply Co.*, 170 B.R. 503, 520 (Bankr. E.D.N.Y. 1994). The bottom line is, "to the greatest extent possible, a selected estimation procedure should not run counter to the efficient and expeditious administration of the bankruptcy estate." *In re G-I Holdings, Inc.*, 323 B.R. 583, 599 (Bankr. D.N.J. 2005). The substance of the claim rather than overly formalized procedural rules should be the paramount consideration. *See Bittner v. Borne Chemical Co.,* 691 F.2d 134,135 (3d Cir. 1982) ("Where there is sufficient evidence on which to base a reasonable estimate of the claim, the bankruptcy judge shall determine the value…the court is bound by the legal rules which may govern the ultimate value of the claim.")

Given the court's discretion in determining the best method for claim estimation and the general principles of expediency in bankruptcy law, it is appropriate in this case to opt for a quick and informal method of claim estimation. The Debtor's Chapter 11 case has been pending for over three years; the plan has been confirmed, and this is the last claim to be decided. The parties have been litigating for about two years, including one appeal to the District Court. The Debtor has consistently denied liability to the CRI Committee and the EPA, taking the position that the site is dormant, the Consent Order cannot be unilaterally amended by the EPA, and that

8

the Debtor has no further liability for the cleanup. (See, e.g., Debtor's Objection filed October 25, 2005 to the CRI Committee's Motion for Leave to Amend).

Even assuming that Rule 26(a)(2) applies in this contested matter, disallowing the Debtor's expert's testimony because his report did not list every document he reviewed in this case hinders the estimation proceeding on at least two grounds. First, such trial-like formality runs counter to this Court's preferred method of a speedy estimation process. Second, engaging in a time-consuming proceeding contradicts the purpose of both claim estimation and bankruptcy law -- the efficient administration of the bankruptcy estate. Finally, the ultimate purpose of the disclosure provisions of Rule 26 has been satisfied by the numerous documents and briefs exchanged by the parties, and the Debtor's unwavering position that the Debtor is not liable to the CRI Committee or the EPA, and has in fact overpaid for the cleanup. Accordingly, the CRI Committee's objections to the Hawthorne's report and testimony are overruled.

## Claim Estimation Analysis

The Debtor objected that the CRI Committee's estimate and classification as a removal action is excessive and questioned why the CRI Committee and the EPA did not analyze less expensive remedial options. The CRI Committee's estimate is $1.9 million,[20] and the Debtor believes the actual cleanup costs will be no more than $75,000. "To value contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real." *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988). After considering the evidence, and the relevant authorities, the Court concludes that the Debtor's estimate is closer to the allowable amount of the claim.

---

[20] CRI arrives at this figure based upon an expert report prepared by Golder Associates (cleanup of $1.7 million), as well as the EPA oversight cost and monies owed to Golder itself ($200,000).

9

CERCLA provides the EPA with a framework of tools to achieve the efficient and effective cleanup of hazardous waste sites. *See* 42 U.S.C. §9601; *Frey v. EPA*, 403 F.3d 828, 833 (7th Cir. 2005); *United States v. Occidental Chem. Corp.*, 200 F.3d 143 (3d Cir. 1999). CERCLA § 104 authorizes the President (who has delegated most of his authority under CERCLA to the EPA) to use Superfund money to respond to any threatened or actual release of any hazardous substance that may pose an imminent and substantial threat to public health. *See* 42 U.S.C. § 9604. CERCLA § 107 provides for the recovery of response costs from all persons responsible for the release of a hazardous substance. *In re Bell Petroleum Servs.*, 3 F.3d 889, 894 (5th Cir. 1993).

To establish a prima facie case under §107(a) of CERCLA, the EPA must prove five elements: (1) the defendant is among the four categories of responsible parties enumerated in § 107(a); (2) the site is a "facility" as defined in § 101(9); (3) there was a "release" or "threatened release" of "hazardous substances" at the facility; (4) the United States incurred costs responding to the release or threatened release; and (5) the costs and response actions conform to the national contingency plan under CERCLA § 107(a)(4)(A) as administered by the EPA. *United States v. 175 Inwood Assocs. LLP*, 330 F. Supp. 2d 213, 220-221 (E.D.N.Y. 2004), citing *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 514 (2d Cir. 1996); *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 719-20 (2d Cir. 1993). In this case, there is little doubt that the Debtor is a person who arranged for the disposal of hazardous substances at the site, and thus is a covered person under the statute.[21] Also, it is not disputable that the site is a facility at which a release or threatened release occurred. However, the Debtor disputes that the United States has incurred unreimbursed costs responding to the release, and contends that if such costs are incurred in the

---

[21] The CRI Committee introduced copies of waste delivery tickets showing the Debtor shipped paint wastes to the site.

future, the estimate contained in the Claim filed on behalf of the EPA by the CRI Committee does not conform to the requirements of the national contingency plan.

At first blush, there appears to be merit in the Debtor's argument that the "surrogate claim" filed by the CRI Committee on behalf of the EPA must be disallowed because the EPA itself is not spending the response costs. The funds to be expended for the remaining cleanup will in all likelihood come from the CRI Committee and the other PRPs who have not filed bankruptcy and not the government itself. However, in disallowing the CRI Committee's and Glidden's individual claims under § 502(e)(1)(B) of the Bankruptcy Code, this Court necessarily found that those parties are liable *with the Debtor* to the EPA. *See In re Hemingway Transp.*, 993 F.2d 915 (1st Cir. 1993). If the Debtor is not liable to the EPA because the EPA has not spent any money, then the provisions of § 502(e)(1)(B) do not apply, and Glidden and the CRI Committee can prove their own contingent claims for the cleanup. The Debtor cannot escape liability to all parties, simply because the amount of the claim is contingent and unliquidated. While there cannot be multiple claims for the same contingent, unliquidated liability, there can be one claim, the claim at issue in this case. *See id.*, 993 F.2d at 923 (sole purpose of Bankruptcy Code § 502(e)(1)(B) is to "preclude redundant recoveries on identical claims against insolvent estates" and "double-dipping" resulting from EPA and PRP claim for the same future CERCLA response costs.) Accordingly, the Debtor's objection based on the EPA's failure to have spent any money is denied, and the issue for decision is whether the costs estimated by the CRI Committee would conform to the national contingency plan under CERCLA.

"CERCLA response actions fall into two categories: removal and remedial actions. Removal refers to a short-term action taken to halt risks posed by hazardous wastes immediately. Remedial actions involve permanent solutions, taken instead of or in addition to removal, such as

the destruction of hazardous materials." *Frey,* 403 F.3d at 835. *Frey* concerned a remedial action, because it dealt with "actions consistent with permanent remedy" including a long–term excavation and destruction of hazardous materials. 42 U.S.C. § 9601(24).

The distinction is important because if the cleanup is a remedial action, regulations require that the site be included on the National Priorities List and that the EPA consider the cost effectiveness of the remediation. *United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1226 (9th Cir. 2005), cert. denied, ___ U.S. ____, 166 L.Ed.2d 268 (2006). "In contrast, the regulatory requirements for removal actions, which provide the EPA with substantial flexibility to tailor prompt and effective responses to immediate threats to human health and the environment, are considerably relaxed." *Id.* Determining whether the cleanup is a remedial or removal action is complicated by the fact that "(e)lements of either response action may overlap and semantics often obscure the actual nature of the cleanup being performed." *Pub. Serv. of Colo. v. Gates Rubber Co.*, 175 F.3d 1177, 1182 (10th Cir. 1999).

The CRI Committee alleges that this cleanup is a removal action, and the Debtor disagrees. The standard for determining allowed costs of a removal action is two-fold. First, the EPA's costs must be upheld unless the party challenging the claim proves the method chosen for the cleanup was arbitrary and capricious. Second, the EPA action must be properly characterized as a removal action. *See W.R. Grace & Co.* at 1233. The arbitrary and capricious standard of review instructs a court to make the narrow determination of whether the EPA's decision is based upon consideration of relevant factors and is not a clear error of judgment. *Motor Vehicle Mfg. Ass'n of U.S. Inc. v. State Farm Mut. Auto.*, 463 U.S. 29, 43 (1983). The agency must present a clear explanation of the relevant data, and the reviewing court will not substitute its judgment for the agency. *Id.* However, this Court has not heard from the EPA, and is cognizant

12
Case 04-22421-gmh    Doc 3714    Entered 07/19/07 16:32:56    Page 12 of 17

that it should not "supply a reasoned basis for the agency's action that the agency itself has not given." *Id.*

National Contingency Plan regulations require the EPA to consider eight factors before deciding whether to conduct a removal action:

(i)   Actual or potential exposure to nearby human populations, animals, or the food chain from hazardous substances or pollutants or contaminants;

(ii)  Actual or potential contamination of drinking water supplies or sensitive ecosystems;

(iii) Hazardous substances or pollutants or contaminants in drums, barrels, tanks, or other bulk storage containers, that may pose a threat of release;

(iv)  High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface, that may migrate;

(v)   Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;

(vi)  Threat of fire or explosion;

(vii) The availability of other appropriate federal or state response mechanisms to respond to the release; and

(viii) Other situations or factors that may pose threats to public health or welfare of the United States or the environment.

40 C.F.R. § 300.415(b)(2).

In *W.R..Grace & Co.,* a removal decision was upheld when the EPA's consideration of these factors was supported by extensive documentation.[22] The EPA's findings "detailed specific threats with carefully documented reasoning." *W.R. Grace & Co.*, 429 F.3d at 1233. By contrast, in *United States v. Wash. State DOT*, 2007 U.S. Dist. LEXIS 8796 (February 7, 2007), the court found the evidence to support the removal decision lacking, for many of the same

---

[22] In *W.R. Grace*, the EPA established a scientific foundation for the immediate threat via thousands of pages of documents, detailed evaluations of the threat in three Action Memos, comprehensive reports in the administrative record by EPA toxicologists, extensive responses to PRPs' comments on the cleanup, and lengthy findings by the Agency for Toxic Substances and Disease Registry on medical testing conducted on the site's residents.

13

reasons that exist in this case. For example, in discussing a contaminated plume of groundwater that was allegedly migrating toward uncontaminated wells, the court said "[I]t is unclear how this evidence may be used to support a time-sensitive removal. . . . [T]he groundwater path does not evidence the rate of migration. The parties agree that at least some of the contamination is traceable to events that occurred in 1970. The Court therefore concludes that the record of evidence of groundwater flow does not demonstrate how this contamination, of which the City and the EPA had been aware since 1993, became an urgent concern in 1997." *Id.* at *34 (internal citations omitted). In denying the costs of the removal action, the court concluded: "While much of the EPA's analysis references scientific evidence in the record, the evidence cited is often of little or no relevance to the overall question of whether the conditions at the Site were such that cleanup, in the form of a *time-sensitive removal*, was appropriate." *Id.* at *44 (emphasis in original).

In this case, it is similarly impossible to conclude that the evidence justifies a "time-sensitive response to public health threats," when there has been no cleanup for 17 years.[23] In fact, it appears that in the absence of immediate attention the CRI Site has remained stable. For example, there is no evidence that the groundwater has or even could carry hazardous substances off the site,[24] and the CRI Site is fenced in and bordered by railroad tracks and a highway,

---

[23] In 2005 and again in March of 2006, the CRI Committee received an Action Memorandum from the EPA that stated removal action is time critical and should be accomplished within 12 months according to the NCP. However, over 12 months have passed since March 2006, and no soil removal has begun. Again, there was no EPA witness to explain or confirm that an immediate removal action is necessary at this site or to provide the detailed documentary evidence that the factors of 40 C.F.R. § 300.415(b)(2) have been met.

[24] Contaminated groundwater often poses an imminent threat in cleanup situations. *See Colorado v. Sunoco*, 373 F.3d 1233 (10th Cir. 2003). Due to the nature of the soil here, the Debtor disputes that the site even contains groundwater. The CRI Committee admits that there is no plume of groundwater that could migrate onto neighboring property or into drinking water supplies.

presumably preventing children from entering.[25] The site is lush and green with vegetation, reducing the risk of the contaminated soils becoming airborne, and natural attenuation seems to have mitigated a great deal of the problem. Given the lack of any evidence that public health or safety has been threatened during the long period of inactivity, it is highly doubtful that the site in fact requires "immediate attention," and extremely speculative that an expensive removal procedure in which 80 trucks full of contaminated soil are driven across several states to a treatment facility is justifiable under the CERCLA standards and national contingency plan regulations.[26]

    Further, it is important to reiterate that the CRI Committee did not produce any witnesses from the EPA to discuss how the site poses an imminent public health threat nor to explain how much, if any, soil will need to be excavated. Such testimony could have clarified and supported the CRI Committee's position that a removal action complies with the NCP and will cost $1.7 to $1.9 million. While some documents exist in the form of findings from Golder Associates, the conclusions and methodology were challenged by the Debtor's expert, and the EPA's own report suggests that far less soil may be required to be removed than Golder's report suggests. It is also important to note that after participating in the 1989 removal action, the Debtor withdrew from the CRI Committee and the Participation Agreement after a long period of inactivity.[27] The CRI Committee has presented no evidence to show that the Debtor did anything to the CRI Site in the meantime that contributed to the alleged need to take emergency action in 2007.

---

[25] The EPA's Modified Statements of Work mention the risk of children wandering onto the property as a justification for the removal action. Absolutely no evidence supports that any trespasser has entered or can enter the Site.

[26] The first EPA site inspection was 1980 and the risk was "low". The 1989 Administrative Consent Order was signed. The Golder Associates report in 1990 stated that the CRI site was stabilized. In 1994 the EPA archived the CRI site. The new On Scene Coordinator visited the site in 2004, noted a problem with the fence, and the CRI Committee was "reactivated".

[27] A 1990 report from Golder Associates stated the site was stabilized.

The CRI Committee has not presented any clear evidence that the EPA actually views the CRI Site as an imminent threat to human health or the environment warranting a removal action[28] or that the EPA could support such a decision with appropriate documentation. The CRI Site is a commercial site used only for industrial purposes, is fenced and secure, and no migrating groundwater issues exist. The contaminated soil has existed untreated since at least 1989, and natural attenuation appears to be reducing the contamination. Assuming that some cleanup is required, there is insufficient evidence that the most expensive and least desirable process of removing and trucking the soil across two states would be upheld, especially without considering less expensive, but equally protective options. In a remediation, "Costs that are grossly excessive compared to the overall effectiveness of alternatives may be considered as one of several factors used to eliminate alternatives. Alternatives providing effectiveness and implementability similar to that of another alternative by employing a similar method of treatment or engineering control, but at greater cost, may be eliminated." [29]

## Conclusion

After careful consideration of the evidence presented in the claim estimation hearing, and the extremely well-presented arguments of the parties, the court estimates the Claim filed by the CRI Committee on behalf of the EPA at the high end of the range given by the Debtor's expert: $75,000. Although it is arguable that the Debtor is *not* jointly and severally liable for 100% of this amount, the Debtor did not present evidence suggesting apportionment, and no such apportionment will be ordered by this court. [30]

---

[28] Witnesses for both sides agreed to this point.
[29] 40 CFR 300.430(e)(7)(iii).
[30] Contrary to the CRI Committee's assertion, "[J]oint and several liability is not mandated under CERCLA; Congress intended that the federal courts impose joint and several liability only in appropriate cases, applying common-law principles. . . .[A]ll of the cases rely on the Restatement [of Torts] in resolving the issues of joint and several liability. The major differences among the cases concern the timing of the resolution of the divisibility question, whether equitable factors should be considered, and whether a defendant can avoid liability for all, or only

However, the CRI Committee stipulated that the Debtor is entitled to a $53,100 credit for funds previously paid to the CRI Committee under the 1989 Consent Order. This amount should be offset from the Claim, reducing the Claim to $21,900. The Debtor's rights to seek contribution and reimbursement from Glidden and the CRI Committee for the amounts to be paid on this Claim are not properly before this Court.

An Order will be entered allowing the Claim in the amount of $75,000, less credit for the overpayment of $53,100, for a total allowed claim of $21,900.

Dated: July 19, 2007

By the Court:

Susan V. Kelley
U.S. Bankruptcy Judge

---

some portion, of the damages." *In re Bell Petroleum Servs.*, 3 F.3d 889, 901 (5th Cir. 1993). However, the party challenging joint and several liability bears the burden to demonstrate the divisibility. *Id.*